UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHELLE SMALL,           )
                                 )
              Plaintiff,     )
                                 )
        v.                )
                                 )   Case No. 11-cv-7778
STATE OF ILLINOIS DEPARTMENT  )
OF PUBLIC HEALTH and         )   Judge John W. Darrah
TERESA GARATE,          )
                                 )
                                 )
             Defendants.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Michelle Small brings this action against her former employer, State of Illinois Department of Public Health ("IDPH"), and Teresa Garate, alleging race and gender discrimination and retaliation for making discrimination complaints, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983. The Defendants have moved for summary judgment on Plaintiff's Complaint. For the reasons set out below, the Defendants' Motion is granted.

## LOCAL RULE 56.1

Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and, in the case of any disagreement, to specifically reference the "affidavits, parts of the record, and other supporting materials relied upon." *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). Rule 56.1(b)(3)(C) further permits

the non-movant to submit additional statements of material facts that "require the denial of summary judgment."

A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 deems those facts admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *see also Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (the district court has discretion to require strict compliance with its local rules governing summary judgment). Accordingly, to the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact which relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

Given the considerations stated above, the Court views Defendants' Rule 56.1 statements supported by the record and not properly rebutted by Plaintiff to be true and uncontested.[1]

## FACTS

The following is taken from the parties' statements of undisputed material facts. Plaintiff Michelle Small is an African-American female, a resident of Cook County, Illinois, who was employed by IDPH from 2003 until she was terminated in August 2010. (Defendant's Rule 56.1

---

[1] It bears noting that Plaintiff makes statements both in her brief and in her Rule 56.1 statements that are not supported by, and are sometimes contrary, to the underlying sources.

Statement of Uncontested Material Facts ("Defs.' SOF") ¶ 1.)[2]  Defendant IDPH is a state agency organized under the laws of the State of Illinois.  Dr. Damon Arnold served as the Director of IDPH from October 1, 2007 through September 30, 2011.  Defendant Dr. Teresa Garate was the Assistant Director of IDPH from December 2009 through August 2012, and also served as Acting Chief of Staff between December 2009 and approximately September 2011. (*Id.* ¶¶ 2-3.)  Deputy Director James Driscoll served as the Deputy Director of Information Technology for IDPH from August 2008 through February 2010.  (*Id.* ¶ 8.)

Plaintiff began working for IDPH in January 2003, at the help desk in the Office of Information Technology ("OIT").  In June 2008, DiAna McCarter (formerly Greene), the Deputy Director of Human Resources, temporarily assigned Plaintiff to be a Public Service Administrator in the Training Resource Center ("TRC") within IDPH's Department of Human Resources.  (*Id.* ¶ 5.)  At that time, the TRC primarily provided in-person trainings regarding new employee orientation, ethics and other HR-related matters.  (*Id.*, Tab 3 ¶ 6.)  Shortly thereafter, McCarter elevated Plaintiff to be the TRC Manager, a Senior Public Service Administrator, Option 1 position, for which she received a four-year term.  As a result of this move, Plaintiff left her union employment and moved to a "merit compensation" position.  As a "merit compensation" employee, Plaintiff was no longer party to any collective bargaining agreements.  (*Id.* ¶ 7.)

---

[2] Defendants have filed corrected copies of their exhibits found at Tabs 1, 4, 6, 9 and 20 of their Statement of Facts.  Where applicable, citations are to the corrected exhibits.

3

In early 2009, the TRC was moved from the Office of Human Resources to the Office of

Information Technology, and Driscoll became Plaintiff's supervisor. (*Id.* ¶ 10.) Dr. Arnold

explained that during this time, IDPH was losing personnel and financing to support the TRC

and that IDPH's budget was cut between 6 to 10 percent every year he was there. (Defs.' SOF ¶

9; *see also* Defs.' SOF, Tab 11, at pp 46, 55-56.) Driscoll also testified that IDPH was "in a cost

reduction mode" in 2009. (Defs.' SOF, Tab 9, at p 19.) Dr. Garate also testified that IDPH was

strapped for resources and budget cuts. (Defs.' SOF ¶ 9.)

In late 2008 or early 2009, IDPH began transitioning to a Learning Management System

("LMS"), an online system that would provide trainings, such as new-employee orientation, at an

employee's desk instead of in-classroom at the TRC. (*Id.* ¶ 12.) Dr. Arnold stated that, "[w]hen

I first joined the agency, I felt that [the TRC] was not organized in a positive way as far as

getting things done efficiently" and that the TRC was "not functioning correctly." (*Id.*) Dr.

Arnold requested that more employees attend online trainings at their desk, instead of traveling

to attend in-person trainings, which saved IDPH and the state considerable money and resources.

(*Id.* ¶ 13, Tab 3 ¶ 7; *see also* Plaintiff's Statement of Additional Facts ("Pl.'s SAF"), Tab H, ¶ 8.)

Dr. Garate also noted that, "What the TRC had been doing could be achieved in other means

through online courses through our LMS system" and that IDPH "did not need a full-time TRC

to [offer courses online]." (Defs.' SOF ¶ 18.)

Dr. Arnold testified that the TRC was offering fewer and fewer trainings and was

"essentially a relic of the HR department, whose employees were left with little work to do in the

TRC." (Defs.' SOF ¶ 12.) Plaintiff disputes, based solely on her own deposition testimony, that

the TRC was "a relic" with little work to do; however, she admits that more online training was being done and that the TRC was offering fewer trainings. (*See* Pl. Resp. to Defs.' SOF ¶ 12; Pl.'s SAF, Tab H, ¶ 8.)[3] Calendar entries maintained by IDPH reflect that the numbers of trainings performed in the TRC dropped dramatically from 248 trainings in 2007 to 3 trainings in 2010. (Defs.' SOF ¶ 14.) By 2010, Kim Small was the only trainer. (*Id.*)

*Plaintiff's Serious Conflicts with the TRC Staff*

When Driscoll started overseeing the TRC in early 2009, it consisted of Plaintiff's managing a department of five individuals. TRC employees included: Bob Teel, Vicky Ritz, Mark Hayes, Jamie Burns and Kim Small. (*Id.* ¶¶ 10-11.) Driscoll testified that "hardly any training was being conducted." (*Id.* ¶ 10.)

The TRC staff repeatedly complained about Plaintiff to IDPH supervisors. (Defs.' SOF ¶ 20.) Driscoll received calls several times a week from the employees Plaintiff supervised, and he stated he felt like the "principal being called into the classroom to bring order back into the TRC." (*Id.* ¶ 21.) He testified that Plaintiff engaged in nitpicking, demeaning treatment of personnel and made insulting statements. (*Id.*; *see also* Defs.' SOF, Tab 9 at p 55.) One TRC employee, Kim Small, who, like Plaintiff, is an African-American woman, frequently complained about Plaintiff's poor management skills, lack of professionalism, and poor communication skills. (*Id.* ¶ 28; *see also* Defs.' SOF, Tab 13 (Kim Small Aff.).) On one occasion, Kim Small pleaded with Dr. Arnold for his intervention in the situation and stated, "I am begging you to save us" from Plaintiff. (Defs.' SOF ¶ 29.)

_____

[3] Plaintiff also contends that Dr. Arnold wanted to maintain "face-to-face" training and cites to his deposition testimony; however, Plaintiff misconstrues that deposition testimony because Dr. Arnold was not testifying about maintaining face-to-face training *in* the TRC. (*Id.*)

Other TRC employees also made complaints to Dr. Arnold about Plaintiff, including that she was threatening, demeaning, and unprofessional. (*Id.* ¶ 30; *see also* Defs.' SOF, Tab 12 (Hayes Aff.); Defs.' Reply to Pl.'s Resp. to Defs.' SOF ("Defs.' Reply SOF"), Tab 1 (Burns Aff.).) Not surprisingly, the parties hotly dispute where the fault lies for the conflicts found within the TRC during this time. However, there is no dispute that Plaintiff and her TRC staff did not get along and that there were strong conflicts within the unit.

Dr. Arnold had conversations with Driscoll about the problems within the TRC and testified that it was a "dysfunctional unit and it wasn't able to function correctly, and this was causing the agency to have problems." (Defs.' SOF ¶ 15.) He further testified that "there was a lot of [dissension] within the group, and this was causing . . . difficulties in a time period when we were having budget cuts, we were losing personnel, and we needed to make sure that this system worked to meet the needs of other employees." (*Id.*)

In February 2009, Driscoll informed Dr. Arnold and Jessica Pickens, IDPH's Chief of Staff, that he did not think the TRC was functioning efficiently or properly, and that Plaintiff was not managing the TRC appropriately, which was evidenced by continued conflicts among the staff. (*Id.* ¶ 16.) Plaintiff disputes Driscoll's conclusion that she mismanaged the TRC and points to a January 2010 memo written that by McCarter that stated Driscoll "was not a strong leader" in connecting with staff. However, that same memo relied upon by Plaintiff also stated that Plaintiff made "poor choices" and "failed to apply wisdom to situations causing . . . further complications to an already volatile situation and is likely to escalate in the future." (Defs.' SOF, Tab 15.)

On May 12, 2009, there was a contentious incident between Plaintiff and a TRC employee, Jaime Burns, regarding the potential last-minute cancellation of a previously

scheduled training to which out-of-town employees were travelling to attend.  (Defs.' SOF ¶ 25.)

The parties dispute who was at fault for the mix-up.  Plaintiff contends that she did not cancel the

training and that Burns failed to submit the proper documents for approval; she submits

McCarter's declaration that McCarter investigated the incident and concluded that Burns's

allegations against Plaintiff were not substantiated.  (Pl.'s Resp. to SOF ¶ 25.)  Defendants

counter that Driscoll and Pickens both agreed that Plaintiff had acted inappropriately in refusing

to approve the training, and they approved the training immediately upon learning of Plaintiff's

refusal.  (Defs.' SOF ¶ 25.)  Plaintiff, however, then refused to communicate the approval of the

training, and Driscoll had to make a phone call to approve it.  (*Id*.)

Moreover, Plaintiff also has submitted a May 12, 2009 email from McCarter regarding

the incident, which appears to put the blame on both Plaintiff and Burns.  McCarter wrote that

she recommended an investigation into the alleged misconduct of Burns, but she also noted that

"Small has a management style that is quite different from what the TRC office is accustomed."

McCarter further recommended that both Burns and Plaintiff be temporarily assigned away from

the TRC "until cooler heads prevail."  (Pl.'s SAF, Tab A, Ex. C.)[4]

On May 13, 2009, in accordance with McCarter's recommendation, Plaintiff was

temporarily assigned away from the TRC in order to address concerns regarding the TRC team

dynamics.  In her deposition, Plaintiff stated that she was assigned away because "the staff was

not willing to work under [her] leadership and they felt that they had needed to remove me from

the position."  (Defs.' SOF ¶ 26.)  During this temporary assignment, Plaintiff worked briefly for

_____

[4] Burns was not disciplined for this incident, as she successfully grieved the discipline.
(Defs.' Reply SOF, Tab 1 ¶ 8 (Burns Aff.).)  Burns also stated in her affidavit that she left the
TRC in 2009 "solely because of the abuse and harassment by Michelle Small and her supervisor,
DiAna [McCarter]." (*Id.*)

Pickens and, then, starting on June 2, 2009, for Winfred Rawls, who worked in the Office of Preparedness and Response. While working for Rawls, Plaintiff did not supervise or manage employees. On November 2, 2009, after her temporary assignment ended, Plaintiff returned to the TRC, at which point the conflicts between Plaintiff and her staff resumed. (*Id.* ¶¶ 26-27.)

The Office of the Executive Inspector General for the Agencies of the Illinois Governor ("OEIG") investigated the in-fighting at the TRC and issued a report on January 15, 2010. (*Id.* ¶ 32.) That report recommended that Dr. Arnold take corrective action regarding the "in-fighting" within the TRC, noted that Plaintiff "both instigated and perpetuated certain conflicts," and recommended taking "further measures" beyond reassignment. (*Id.*; *see also* Defs.' SOF, Tab 10, Ex. D.)[5]

On January 14, 2010, Plaintiff met with Driscoll, Rawls and Dr. Garate to discuss her 2009 work performance.[6] (Defs.' SOF ¶ 34.) Plaintiff claims that it was unusual for Dr. Garate to participate in the meeting because she had not supervised Plaintiff. (Pl.'s SAF ¶ 6.) However, Dr. Garate, in her affidavit, states that she sat in on the meeting because of the unusual supervisory history of Plaintiff, who had been supervised by three individuals in one year (Driscoll, Rawls and, for a brief period, Pickens). (Defs.' Resp. to Pl.'s SAF, Tab 2 ¶ 5.) Furthermore, McCarter, in a February 8, 2010 memorandum, noted that the contentious history between Driscoll and Plaintiff "might even have warranted a witness [Dr. Garate] for the good of all involved." (Defs.' Resp. to Pl.'s SAF ¶ 6; Defs.' Resp. to Pl.'s SAF, Tab 6.)

[5] Because Plaintiff complained, in her response brief, that the copy of the OEIG was redacted and difficult to understand, Defendants provided an unredacted copy with their reply (which they note that Plaintiff had previously received). That unredacted copy shows that the redactions were not about Plaintiff but, rather, about other employees.

[6] Driscoll finalized his evaluation of Plaintiff in February 2010. Rawls did not complete a written evaluation until May 2010. (Defs.' Resp. to Pl.'s SAF ¶ 17-18.)

Driscoll rated Plaintiff as "unacceptable" and noted that he had many complaints from her team about her. (Defs.' SOF ¶ 36.) He also noted that she lacked "knowledge of good supervisory skills," refused to provide hands on training when he requested that she do so, "exhibited poor judgment in dealing with her staff," treated differences of opinion by subordinates as insubordination, did not "cultivate a cooperative leadership style," and exhibited "confrontational and threatening demeanor with management and staff." (*Id.*) While Rawls rated her as "accomplished," he declined to evaluate Plaintiff with respect to the "leadership" category, and stated "Michelle did not supervise, manage or lead employees during her short tenure with [his division.]" (*Id.* ¶ 36.) Dr. Garate explained that Driscoll, as Plaintiff's supervisor, could have completed the evaluation alone, and Plaintiff would have received an overall grade of "unacceptable" for 2009. However, Dr. Garate stated that in order to be fair to Plaintiff, Dr. Garate wrote a performance evaluation that balanced Rawls's positive review with Driscoll's and that, as a result, Plaintiff received a rating of acceptable" for 2009. (*Id.* ¶ 33; *see also* Defs.' Resp. to Pl.'s SAF, Tab 2, ¶¶ 6-7.) [7]

After the meeting, Plaintiff filed three grievances, asking for the 2009 performance review to be overturned and also alleging that she was the victim of discrimination and workplace violence. (Pl.'s SAF ¶ 14.) McCarter, as Deputy Director of HR, investigated the grievances, denied them as being unfounded and/or premature, and noted that Plaintiff was "over reacting to every action of her supervisor [Driscoll], and this could potentially lead to her own

---

[7] Plaintiff contends that Driscoll should have given written notice to her of any performance problem and should have placed her on a corrective action before rating her as unacceptable. (Pl.'s SAF ¶ 13.) Defendants, however, counter that Driscoll testified that he had multiple conversations with Plaintiff, during which he counseled her on how to improve her management skills, including one on March 13, 2009, where he gave her a PowerPoint presentation. (Defs.' SOF, Tab 10, Ex. A.).

self-destruction (i.e. dismissal by her own hands.)." (Pl.'s SAF, Tab A, Ex. I; *see also* Defs.' SOF ¶ 35.) In a January 28, 2010 memorandum, McCarter determined that "there was no evidence of actions during this meeting by [Driscoll] or [Dr. Garate] with intent to intimidate or harass [Plaintiff]." (Defs.' SOF, Tab 15 at 2; *see also* Defs.' SOF ¶ 35.) On February 8, 2010, McCarter sent a memorandum containing these findings to Plaintiff. (Defs.' Resp. to Pl.'s SAF, Tab 6.)

*The IDPH's 2009-2010 Discussions of Reorganizing the TRC*
*and Removing Plaintiff as TRC Manager*

In April 2009, Dr. Arnold, then Chief of Staff Pickens, and McCarter discussed reorganizing the TRC and removing Plaintiff from her position as TRC Manager. (Defs.' SOF ¶ 37.) On October 13, 2009, McCarter wrote an email to Pickens, entitled "Options for Michelle Small," which outlined potential solutions for the TRC's problems and included, as an option, the reorganization of the TRC and the elimination of Plaintiff's position. (*Id.*; *see also* Defs.' SOF, Tab 24.)

Several choices were explored as replacements for the TRC. Dr. Arnold stated that he worked on developing a "SMART-DOC" center for computerized trainings, which ultimately did not get funding. (Defs.' SOF ¶ 41.) Similarly, when Dr. Garate began working for IDPH in December 2009, she had strategic planning discussions with Dr. Arnold, Driscoll, McCarter, and Siobhan Johnson, IDPH's head of Strategic Planning, to identify inefficiencies, cost-cutting measures, and offices that could be streamlined. (*Id.* ¶ 43.) Dr. Garate and Dr. Arnold also discussed creating a "Professional Development Center" as a means to creating a more efficient option than the TRC. They both agreed about the need for the TRC to be reorganized. (*Id.* ¶ 45.)

In the January 28, 2010 memorandum regarding Plaintiff's grievances, McCarter stated that the Office of Human Resources recommended a material reorganization of the TRC and stated that it was "in the best interest of IDPH as well as other employees involved, and due to the fact that the Director's Office has innovative ideas for a division that is more efficient and effective in technologies for the professional development of IDPH employees." (Defs.' SOF ¶ 46.) That same memorandum noted that "[a] material reorganization would layoff Michelle Small, but place her on the CMS reemployment list for one year." (Defs.' SOF, Tab 15, Ex. 16.)

*The IDPH's Formal Initiation of the TRC Reorganization in February 2010*

On February 22, 2010, McCarter sent a letter to the Illinois Department of Central Management Services ("CMS"), informing them that IDPH was requesting permission to materially reorganize the TRC for two reasons: (1) to create a Professional Development Center; and (2) to comply with the recommendation from the Office of the Illinois Executive Inspector. (Defs.' SOF ¶ 47.) McCarter, in her declaration, states that she prepared this letter under Dr. Garate's direction.[8] McCarter also states in her declaration that she said to Dr. Garate that eliminating Plaintiff's job so soon after Plaintiff's grievances could appear to be retaliation, to which Dr. Garate allegedly replied, "I don't care, I want her gone." (Pl.'s SAF, Tab A ¶¶ 47-48.) However, Dr. Garate responds in her affidavit that she informed McCarter that the material reorganization was not about retaliation or discrimination, but, rather, that it was about Dr.

---

[8] In her declaration, McCarter states that she received a copy of the OEIG report after Dr. Garate directed her to prepare the letter in February 2010. (Pl.'s SAF, Tab A ¶ 46.) This statement, however, is contradicted by McCarter's own deposition testimony, in which she testified she had seen the results of the OEIG report at the time of writing her January 28, 2010 memorandum. (Defs.' SOF, Tab 6, pp. 221-223.)

Arnold and Dr. Garate's decision to move forward with the Professional Development Center.[9] (Defs.' Resp. to Pl.'s SAF, Tab 2 ¶ 9.)

On March 29, 2010, Plaintiff received a letter from Dr. Arnold and McCarter, informing her that she would be laid off on May 22, 2010, due to a material reorganization of the TRC. (Defs.' SOF ¶ 48.)  The letter explained, "what this means is that there would be no TRC due to a material reorganization that would affect your position . . . ."  The letter further noted that Plaintiff had "reemployment rights" and "transfer and voluntary reduction rights" pursuant to CMS Personnel Rules and explained, "however, you must apply for any available positions." (*Id.* ¶ 48.)  The letter also stated that "this layoff was necessary for the material reorganization of the [TRC]."  (Defs.' SOF, Tab 27.)

In May 2010, CMS informed McCarter and IDPH that the layoff and reorganization could not go forward at that time.  According to the affidavits from IDPH and CMS employees submitted by Defendants, the layoff was suspended because IDPH had not properly followed CMS's layoff procedure checklist, including IDPH's failure to submit a Final Layoff Package for approval.  (*Id.* ¶ 49; Defs.' Resp. to Pl.'s SAF, Tab 9 ¶ 7.)  McCarter also testified in her deposition that CMS told her that IDPH had done the procedure wrong.  (Defs.' SOF, Tab 6, pp 289.)

However, Plaintiff disputes that the layoff and reorganization was suspended for failure to follow procedure.  Plaintiff contends instead that it was suspended because McCarter told CMS that McCarter believed the reorganization was based on discrimination and retaliation and that she would grant Plaintiff's grievance and rescind the layoff.  (Pl.'s SAF ¶ 28; Pl.'s Resp. to

_____

[9] IDPH was ultimately unable to get funding for the "Professional Development Center" because of budget shortfalls.  (Defs.' SOF ¶¶ 63-64.)

Defs.' SOF ¶ 49.)  In support, Plaintiff cites to a May 17, 2010 email from McCarter to CMS employees and also to McCarter's declaration.  (*Id.*)  However, Plaintiff's contention is not supported by the email she cites.  In the email, McCarter stated that she was "in a complicated dilemma" because of Plaintiff's claims of retaliation and asked if they could alter the layoff plan so that Plaintiff would finish out her term.  Nowhere in the email did McCarter state that McCarter believed the reorganization was based on discrimination or retaliation. (Pl.'s SAF, Tab A, Ex. K.)[10]

IDPH restarted the reorganization process and, on June 30, 2010, sent a letter to CMS, explaining that IDPH "is reorganizing to disband its [TRC]" and, therefore, "the Division Manager position is no longer required and will be abolished."  (Defs.' SOF ¶ 50.)  Employees in union positions, Vicky Ritz, Kim Small, Mark Hayes, and George Tee, were impacted but reassigned.  Vacant positions within the TRC were abolished. (*Id.*)

On July 8, 2010, IDPH sent a memorandum to Plaintiff, notifying her that she would be laid off effective August 16, 2010 due to the reorganization and stated her position would be abolished.  (*Id.* ¶ 52.)  The memo also noted that Plaintiff had reemployment, transfer, and voluntary reduction rights pursuant to CMS Personnel Rules, but that she "must be eligible and apply for any available positions" and that "[a]t this time, IDPH does not have any merit compensation positions available to be filled." (*Id.*)

Prior to her layoff, Plaintiff talked with McCarter, Johnson and IDPH employee Ginger Engle about finding another position with IDPH, inquired about several jobs for which she was

---

[10] Plaintiff also cites to McCarter's declaration, in which McCarter claims that she investigated Plaintiff's grievance and concluded that Plaintiff was the victim of discrimination and retaliation.  However, as discussed below, McCarter's conclusions stated in her declaration are insufficient to support Plaintiff's claims.

not qualified, and was unsuccessful in finding a new position. (*Id.* ¶ 55.) For example, on April 2, 2010, Plaintiff emailed Dr. Arnold and McCarter seeking a lateral transfer into IDPH's Chief Information Officer ("CIO") position. McCarter, however, told Plaintiff that Plaintiff did not have the appropriate "promotional 'A' grade" for the CIO position. (*Id.* ¶ 56.) Plaintiff also inquired about negotiating with the AFSCME union regarding a vacant union position. McCarter responded that was "not a viable option at this point because placing [Plaintiff] in this position would 'negatively impact' AFSCME members." (*Id.*)

On April 15, 2010, Plaintiff emailed IDPH's HR Department, seeking to apply for a position as a Senior Public Services Administrator with IDPH's Office of Epidemiology and Health Systems Development. (*Id.* ¶ 59.) McCarter told Plaintiff that her "application does not indicate that you have experience for this position." (*Id.*) Likewise, on April 27, 2010, Plaintiff emailed McCarter and Engle regarding a Labor Relations position. McCarter responded that the Labor Relations position required abilities Plaintiff did not have, including "expertise and experience in contract negotiations" and labor relations. Plaintiff acknowledged in her deposition that she did not have contract negotiations expertise. (*Id.* ¶ 60.)

Plaintiff's last day of employment with IDPH was August 16, 2010. Plaintiff's former position, TRC Manager, SPSA, Option 1, was abolished and no longer exists. (*Id.* ¶ 54.)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets

this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. ESPO Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

A Title VII plaintiff may proceed either under the direct method, by presenting evidence of discriminatory intent, or the indirect, burden-shifting method. *Hildebrandt v. Ill. Dep't of Natural Resources*, 347 F.3d 1014, 1029 (7th Cir. 2003).[11] Under the direct method, the plaintiff must provide "either direct evidence or circumstantial evidence that shows that the employer acted based on prohibited animus." *Brown v. Advocate S. Suburban Hosp. & Advocate Health &*

---

[11] The requirements for proving discrimination are the same whether asserted under Title VII or § 1981. *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 850n.7 (7th Cir. 2010).

*Hosps. Corp.,* 700 F.3d 1101, 1105 (7th Cir. 2012) (*Brown*) (internal quotations and citation omitted).

In contrast, under the indirect method, a plaintiff may establish a *prima facie* case of discrimination by showing:  (1) membership in a protected class; (2) performance meeting the employer's legitimate expectations; (3) an adverse employment action; and (4) similarly situated employees outside of the protected class who were treated more favorably.  *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007) (*Hossack*); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  If the plaintiff satisfies this burden, the employer then has the burden to articulate a legitimate, nondiscriminatory reason for its decision.  *Hossack*, 492 F.3d at 860.  The plaintiff may then challenge that reason as a pretext for discrimination.  *See also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009) (*Coffman*).

<em>The Direct Method</em>

Plaintiff contends that she can prevail under the direct method.  Plaintiff has offered no evidence of any admissions by Defendants of racial or gender discrimination.  *See Brown*, 700 F.3d at 1105; *see also Coffman*, 578 F.3d at 563 (affirming dismissal on summary judgment where plaintiff failed to advance direct or circumstantial evidence of sex discrimination).  Because Defendants have not openly admitted to discriminating against Plaintiff, Plaintiff must construct a "convincing mosaic of discrimination of circumstantial evidence" to proceed under the direct method.  *See Brown*, 700 F.3d at 1104.  The Seventh Circuit has explained that:

The pieces of this mosaic generally take one of three forms. First, the plaintiffs may show evidence of suspicious timing, ambiguous behavior, statements or comments directed at employees in the protected group, and "other bits and pieces from which an inference of discriminatory intent might be drawn." Second, they may provide evidence that a "similarly situated employee received more favorable treatment." And third, they may provide evidence that the plaintiff "was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic, and that the employer's stated reason for the difference in treatment is unworthy of belief."

*Id.* at 1105 (quoting *Phelan v. Cook Cnty*, 463 F.3d 773, 779 (7th Cir. 2006)).

Plaintiff has failed to construct such a mosaic. Plaintiff argues that she was the only TRC employee to be terminated and that the other TRC employees were given positions at IDPH without having to apply. (Pl.'s Br. at 6.) Defendants counter that Plaintiff, a non-union employee, and her TRC subordinates, who were all union members, were subject to different protocols. As such, the union TRC employees were reassigned pursuant to their collective bargaining agreement, while Plaintiff was required to apply for available "merit compensation employee" positions. (Defs.' SOF ¶¶ 51, 53, 65-68.) IDPH even asked the union to allow Plaintiff to waive into a union position, but the union refused to do so. (Defs.' Reply SOF ¶ 57.) Plaintiff has not identified any merit compensation positions for which she was qualified and to which she applied.

Plaintiff also contends "that Dr. Garate took active steps to prevent Plaintiff from obtaining any other position even when people like Rawls and [Dorian] Jones requested Plaintiff." (Pl.'s Br. at 6.) Plaintiff's contention is unsupported by the record. In his affidavit, Jones, who was the Deputy Director of the OIT starting in 2010, stated that he did not submit any personnel requests for Plaintiff and that the positions he received approval to fill were all covered by the collective bargaining agreement. (Defs.' Resp. to Pl.'s SAF, Tab 8 ¶¶ 3-4.) Likewise, Rawls stated in his affidavit that he did not submit Plaintiff's name for an open merit

compensation position and, furthermore, that Plaintiff refused his offer of one position because it was not a senior or management position. (Defs.' Resp. to Pl.'s SAF, Tab 7 ¶¶ 4, 6.)

Plaintiff also has not provided any evidence that Dr. Garate took any steps to prevent Jones or Rawls from submitting personnel requests on Plaintiff's behalf. Plaintiff relies on Dr. Garate's statement to McCarter that she wanted Plaintiff "gone." However, this statement was made in the context of the reorganization of the TRC, which was indisputably a dysfunctional unit full of in-fighting and conflict. (Defs.' Resp. to Pl.'s SAF ¶ 20.) It does not support that Dr. Garate improperly interfered with Plaintiff finding a new job.

Plaintiff also argues that she has presented "a pattern of race discrimination." (Pl.'s Br. at 7.) In support, Plaintiff alleges that after McCarter granted Plaintiff's third level grievance, McCarter was fired and replaced by a Caucasian woman, Siobhan Johnson, who allegedly had no HR experience. (*Id.*) Apart from this allegation, Plaintiff has presented no evidence of discrimination against McCarter. However, Defendants have presented evidence that McCarter, an at-will employee, was fired after senior staff made complaints about her judgment as HR director. (*See* Defs.' SOF, Tab 4, Garate Dep. pp. 57-58.)

Plaintiff also alleges that Jonathan Lackland, a non-IDPH employee, told Dr. Arnold (who is, incidentally, an African-American) that IDPH had mistreated several African-Americans. Lackland's declaration is based on what he had been told by Plaintiff and other unidentified African-Americans. (*See* Pl.'s SAF, Ex. Q.) As such, his declaration is inadmissible hearsay and cannot be used to oppose summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.").

18

Likewise, Plaintiff alleges that McCarter was aware of several incidents of discrimination but does not establish that McCarter had first-hand knowledge of those incidents. As with Lackland, any such testimony would be inadmissible hearsay and cannot defeat a motion for summary judgment. *Id.* Because Plaintiff has failed to provide direct or convincing circumstantial evidence of discrimination, she cannot prevail under the direct method of proof.

*The Indirect Method*

Since she cannot prevail under the direct method, Plaintiff must establish all four elements of a *prima facie* case of discrimination under the indirect method of proof. *See Lucas v. Chi. Transit Auth.,* 367 F.3d 714, 728 (7th Cir. 2004) (*Lucas*). Defendants concede that Plaintiff satisfies both the first and third elements, as she is a member of a protected class who suffered an adverse employment action when she was fired.

*IDPH's Legitimate Expectations*

Plaintiff must establish the second element that she was performing well enough to meet her IDPH's legitimate expectations. *See Hossack*, 492 F.3d at 860. The evidence overwhelmingly shows that Plaintiff was not performing her job well as TRC manager. As discussed above, her supervisor, Driscoll, rated Plaintiff as "unacceptable" in his evaluation. Her TRC staff repeatedly complained about her poor management skills; several of those employees have submitted affidavits describing how difficult it was to work for Plaintiff, including that she was disrespectful, abusive and demeaning. The in-fighting at the TRC also was investigated by the OEIG, which reported that Plaintiff "both instigated and perpetuated certain conflicts."

Plaintiff responds to this evidence by focusing on the incident between Plaintiff and Burns in May 2009 and claims that Driscoll impermissibly based his evaluation of her on that

incident.[12]  (Pl.'s Resp. Br. at 8.)  But there is no evidence that Driscoll based his evaluation solely on the May 2009 incident; rather, the record reflects that Driscoll based his evaluation of Plaintiff on what he had observed as her supervisor and the numerous complaints he received from the TRC employees.

In response to the numerous complaints about Plaintiff made by the TRC employees, Plaintiff relies heavily on the declaration by McCarter.  (Pl.'s Resp. Br. at 8.)  In that declaration, McCarter claims that McCarter met with the TRC staff in August 2008 regarding issues the employees were raising about Plaintiff and concluded that their complaints were motivated by racial discrimination.  (*See* Pl.'s SAF, Tab A, ¶ 23-26.)  McCarter also claims that, as part of her investigation into the May 2009 incident involving Burns, McCarter concluded that the TRC employees were objecting to Plaintiff on the basis of race. (*Id.* ¶¶ 29-30.)

McCarter's conclusion that the TRC employees complained about Plaintiff based on racial discrimination is not based on any stated facts and provides no support for Plaintiff's claims for several other reasons.  First, there is no documentation that supports that McCarter made or expressed these conclusions to anyone during the period while she was employed at IDPH.  The parties have submitted various memoranda and emails that McCarter authored regarding the conflict between Plaintiff and her staff.  Yet, nowhere in those documents does McCarter state that she believed that the TRC employees were acting with racial animus toward Plaintiff.  Second, at her deposition, McCarter testified that she believed the problems between

---

[12]  Plaintiff claims that Driscoll improperly relied on a disciplinary memo regarding the May 2009 incident because that memo was supposedly removed from her personnel file.  (Pl.'s Resp. to Defs.' SOF ¶ 33; *see also* Pl.'s Br. at 8.)  Defendants counter that that disciplinary memo, which was authored by Pickens and stated that Plaintiff's temporary reassignment was based on the May 2009 incident, was not removed and remains in her file today.  (Defs.' Reply Br. at 6.)  Regardless, it is abundantly clear from the record that the May 2009 event was not the only source of conflict within the TRC.

Plaintiff and her staff were due to the fact that Plaintiff had a different management style, a conclusion that is also reflected in McCarter's memorandum. (Defs.' Reply SOF ¶¶ 22, 33.)

Third, there is no evidence that any of the TRC employees were ever disciplined or accused of racist behavior. Furthermore, in her declaration, McCarter describes meeting with Kim Small and acknowledging Kim Small's complaints about Plaintiff, yet does not explain why Kim Small, as an African-American woman, would be motivated by racial animus to complain about Plaintiff. Indeed, Kim Small has submitted an affidavit, in which she states: "I am surprised to learn that Michelle Small thinks that the TRC was dissolved and also that she was laid off because she is a black woman. I am a black woman, and from my observation, do not believe that the IDPH discriminated against Michelle Small when they closed the TRC and laid her off." (Defs.' SOF, Tab 13 ¶ 25.)[13] McCarter's claims of racism in her affidavit come after she was fired from IDPH and are contrary to the record.

As the record clearly establishes that Plaintiff was a poor manager with a history of conflict with her staff, Plaintiff has not carried her burden that she was meeting IDPH's legitimate expectations. *See, e.g., Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (plaintiff, a supervisor who was frequently disrespectful and argumentative with subordinates and peers, was not meeting employer's legitimate expectations.).

---

[13] Plaintiff's former subordinate, Mark Hayes, also has submitted an affidavit detailing Plaintiff's demeaning and demanding managing style. (Defs.' SOF, Tab 12, ¶¶ 5-7.) He also states that he had no problem with Plaintiff based on her race and that he has frequently worked with and for several African-Americans, including receiving a "commendable" evaluation from an African-American supervisor and excellence awards from African-American directors at IDPH. (*Id.* ¶ 8.)

*Similarly Situated Employees*

Plaintiff also has not established the fourth element of a *prima facie* case: that a similarly situated employee not in a protected class was treated more favorably than she was. *See Lucas*, 367 F.3d at 728. The Seventh Circuit has explained that "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (*Coleman*) (internal quotations and citations omitted). The purpose of this analysis is "to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable' — discriminatory animus." *Id.* (quoting *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 405 (7th Cir. 2007)).

Plaintiff argues that both similarly situated male and non-black employees were treated better than she was. Plaintiff cites to the TRC employees and contends that she was the only TRC employee to lose her job. However, as discussed above, Plaintiff was the only non-union member of the TRC, and she was also its manager. Her TRC subordinates were union members who had different rights under their collective bargaining agreement, particularly regarding obtaining open positions, and for that reason, were not similarly situated to Plaintiff. *See, e.g., Milloy v. WBBM-TV, Chicago*, 613 F. Supp. 2d 1035, 1037 (N.D. Ill. 2009) ("differences in status have consistently been held to negate the "similarly situated" test [including] managerial vs. non-managerial [and] union vs. non-union members") (internal citations omitted). Plaintiff also cites to employees who worked in offices other than the TRC, including ones that did not work in the IT department. Those non-TRC employees are not sufficiently similar to Plaintiff because their offices were never targeted for reorganization like the TRC. Plaintiff has not

identified any employees that are directly comparable to her in all material respects and therefore cannot establish the fourth element of her *prima facie* case.

Plaintiff also argues that she has proved a *prima facie* case under the "mini-RIF" ("reduction in force") modified standard and that, therefore, she does not need to satisfy the similarly situated employee element. (Pl.'s Br. at 9-10.) In *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000), the Seventh Circuit stated that "[i]n a mini-RIF, a single employee is discharged and his position is not filled; [h]owever, the employee's responsibilities are assumed by other members of the corporate workforce." Consequently, whether an action is a RIF (or a mini-RIF) depends on whether the defendant still required the plaintiff's job responsibilities to be performed. *Id.* at 694. To that end, the mini-RIF plaintiff must present evidence that his position was absorbed, not eliminated. *Id.*; *see also Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 725 (7th Cir. 2008) ("the determinative factor in deciding whether the mini-RIF variation applies is whether the discharged employee's duties were absorbed by an existing employee or eliminated"). In this case, it is undisputed that Plaintiff's position as TRC manager was eliminated. There is no evidence that her managerial responsibilities were absorbed by other TRC employees, particularly since the TRC was

eliminated altogether.  Consequently, the mini-RIF modified standard does not apply in this

situation. [14]

*Pretext*

Even if Plaintiff could make out a *prima facie* case of discrimination, Defendants have

offered a legitimate, nondiscriminatory reason for terminating Plaintiff: the elimination of the

TRC.  In determining whether an employer's stated reason is pretextual, "[t]he question is not

whether the employer's stated reason was inaccurate or unfair, but whether the employer

honestly believed the reasons it has offered to explain the discharge."  *O'Leary v. Accretive*

*Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011).  "[I]t is not the court's concern that an employer

may be wrong about its employee's performance, or be too hard on its employee.  Rather, the

only question is whether the employer's proffered reason was pretextual, meaning that it was a

---

[14] Likewise, Plaintiff's reliance on *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793-94 (7th Cir. 1997) (*Leffel*) for her contention that she does not need to satisfy the "similarly situated" element is misplaced.  *Leffel* concerned an ADA plaintiff whose position as a branch manager had such "unique aspects" that made it difficult to identify other similarly situated employees. The Seventh Circuit determined that in that situation, it would be unfair to strictly apply the *McDonnell Douglas* framework and permitted the plaintiff to try to demonstrate discrimination through other circumstances (which she failed to do).  *Id.* at 794.  Such a unique situation is not presented here.  Unlike in *Leffel*, Plaintiff was one of almost twenty SPSA Opt 1 managers that worked throughout IDPH.  (Defs.' Reply SOF ¶ 65.)  Furthermore, the majority of cases after *Leffel* make clear that *Leffel* did not eliminate the similarly situated requirement.  *See, e.g., Amrhein v. Health Care Service Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (affirming district court's grant of summary judgment where plaintiff did not identify any similarly situated employees that were terminated); *Herrera v. Illinois Bell Telephone Co.*, 2013 WL 654920, at *16 (N.D. Ill. Feb. 21, 2013) (collecting cases applying similarly situated requirement).  In *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1126 (7th Cir. 2006) (*Timmons*), the Seventh Circuit explained that the "usual statement of the [*McDonnell Douglas*] test" requires a showing of the similarly situated employees.  The *Timmons* Court further commented that the *Leffel*'s broader, alternative formulation is "hardly a true version of the test," because if the plaintiff can satisfy *Leffel*'s "more broadly stated version" through circumstantial evidence, than the plaintiff has satisfied the direct method of discrimination and has no need for the *McDonnell Douglas* burden-shifting framework.  *Id.* at 1126-1127.  As discussed above, Plaintiff here has not presented sufficient circumstantial evidence to satisfy either the direct or indirect method.

24

lie." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005). In short, to meet this burden, Plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions" in Defendants' stated reason "that a reasonable person could find [it] unworthy of credence." *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 792 (7th Cir. 2007) (applying this standard in the discrimination context).

Defendants have established IDPH's upper management agreed that the TRC needed to be eliminated because it was no longer an efficient means of providing training to IDPH employees and because it was not functioning well under Plaintiff's management. (*See, e.g.,* Defs.' SOF, Tab 3 (Dr. Arnold Aff.)). The trainings provided by the TRC had dropped dramatically and the IDPH was transitioning to an online system for trainings. Dr. Arnold, the IDPH Director at the time, stated that IDPH was experiencing budget cuts and that the TRC was not functioning properly. He further stated that "the dissolution of the TRC had nothing to do with Michelle Small's position as manager . . . and would have taken place regardless of who served in that position." (*Id.* ¶ 16.)

Plaintiff has not rebutted these reasonable explanations for why the TRC was reorganized and she was laid off. Plaintiff has not carried her burden to show that the Defendants' stated reason was a lie, or otherwise pretextual. Plaintiff's claims that race and gender discrimination are without evidentiary support and, therefore, fail.

*Plaintiff's Retaliation Claim*

A plaintiff may establish a retaliation claim under Title VII by either a direct or indirect method of proof. Under the direct method, a plaintiff must present evidence that: (1) she engaged in an activity protected under Title VII; (2) that she suffered a materially adverse

employment action; and (3) a causal connection between the two. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 307-308 (7th Cir. 2012).

Under the indirect method, a plaintiff must show she: (1) engaged in a statutorily protected activity, (2) met the employer's expectations of her satisfactorily, (3) suffered a materially adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in the protected activity. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (*Tomanovich*). Once a plaintiff has established a *prima facie* case for retaliation under the indirect method, the burden shifts to the defendant to show it had a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant meets that burden, the burden shifts back to the plaintiff, who must then show that there was a genuine issue of material fact as to whether or not the non-discriminatory basis was pretextual. *Id.*

Plaintiff contends that she was fired in retaliation for filing grievances, alleging discrimination in January 2010 after her meeting with Dr. Garate, Driscoll and Rawls regarding her 2009 performance evaluation. In her response to Defendants' motion, Plaintiff has addressed her retaliation claim only briefly and incorporates her arguments made regarding her discrimination claims. Plaintiff argues that she has proved retaliation under the direct method and also made out a *prima facie* case under the indirect method.

Plaintiff has not established a claim of retaliation under the direct method because she cannot show a causal connection between her grievances and her layoff. Efforts to reorganize the TRC and find a better solution for training clearly predate Plaintiff's grievances in January 2010. For example, as discussed *supra*, Dr. Arnold, Pickens, and McCarter began discussing reorganizing the TRC and removing Plaintiff from her position as TRC Manager as early as

April 2009, long before Plaintiff filed her grievances in January 2010. In October 2009, McCarter wrote an email outlining solutions for the TRC's problems and including reorganization as a solution. Likewise, in December 2009, shortly after she started working for IDPH, Dr. Garate began pursuing the development of the Professional Development Center to replace the TRC.

Plaintiff also cannot make out a *prima facie* case of retaliation under the indirect method. As discussed *supra*, Plaintiff was not meeting IDPH's legitimate expectations in the performance of her job duties, nor has she identified any similarly situated employees that were treated better than she was. Furthermore, even if Plaintiff could satisfy those elements, she cannot show that Defendants' reasons for reorganizing the TRC and laying off Plaintiff were pretextual for discrimination. Plaintiff's claim of retaliation, therefore, fails.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment [28] is granted.


Date:___March 28, 2013_____          _____
                                          JOHN W. DARRAH
                                          United States District Court Judge